UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| ADVANCED PHYSICIANS, S.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:16-CV-2355-G |
| CONNECTICUT GENERAL LIFE | ) | |
| INSURANCE COMPANY; CIGNA | ) | |
| HEALTH AND LIFE INSURANCE | ) | |
| COMPANY; CIGNA HEALTHCARE | ) | |
| MANAGEMENT, INC.; GREAT-WEST | ) | |
| HEALTHCARE-CIGNA and NFL | ) | |
| PLAYER INSURANCE PLAN, | ) | |
| | ) | |
| Defendants. | ) | |


## MEMORANDUM OPINION AND ORDER

Before the court are the cross-motions for summary judgment of the plaintiff

Advanced Physicians, S.C. ("Advanced") (docket entry 220) and the defendants

Connecticut General Life Insurance Company, Cigna Health and Life Insurance

Company, Cigna Healthcare Management, Inc., and Great-West Healthcare-Cigna

(collectively "Cigna"), and NFL Player Insurance Plan (the "Plan") (docket entry

218), as well as the defendants' motion to strike portions of Advanced's summary

judgment evidence (docket entry 235).  For the reasons set forth herein, Advanced's

motion for summary judgment is denied, Cigna's motion for summary judgment is granted, and Cigna's motion to strike is granted in part and denied in part as moot.

## I. BACKGROUND

### A. Factual Background

#### 1. *The Parties*

The plaintiff, Advanced, is a Chicago area medical clinic that employs medical doctors, chiropractors, and physical therapists, offering diagnostic and treatment services to patients. *See* Advanced's Appendix at 2, ¶ 5 (docket entry 231); Brief in Support of Defendants' Motion for Summary Judgment ("Cigna's Motion") (docket entry 227) at 2. Advanced began treating retired National Football League ("NFL") players in 2007. Advanced's Appendix at 3, ¶ 8. As of the date of these cross-filings, Advanced has treated over 180 retired NFL players. *See* Cigna's Motion at 15.

The NFL Player Insurance Plan is an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), providing medical benefits to current and former NFL players ("Participants"). *See* Cigna's Motion at 2; Advanced's Brief in Support of Summary Judgment ("Advanced's Motion") (docket entry 230) at 5. The Plan is funded by the NFL Players Insurance Plan Trust, which is in turn funded by NFL member clubs. *See* Advanced's Appendix at 55, ¶ 1.86; Cigna's Appendix at 16 (docket entry 228). The Plan authorizes the appointment of a plan administrator to administer plan benefits. *See* Advanced's Appendix at 46, ¶

1.1.  The Plan also authorizes participants to assign their claims to health care providers who may then make claims directly to the Plan.  *See* Cigna's Motion at 4. Many retired NFL players have assigned their claims to Advanced, and Advanced now seeks payment for those services via this suit.

Connecticut General Life Insurance Company was the first designated administrator of the plan.  *See* Advanced's Motion at 5.  That responsibility was later assigned to Cigna, which remains the plan administrator.  See *id*. at 5-6.  Among other responsibilities, Cigna processes claims for benefits submitted under the Plan. *See* Cigna's Motion at 2; Advanced's Motion at 5-6.

## 2. *Plan Details and Procedures*

Pursuant to Department of Labor regulations, participants in the plan are given a Summary Plan Description ("SPD") explaining and summarizing benefits, coverage, and plan administration.  *See* Cigna's Appendix at 7; Advanced's Appendix at 354.  Both Advanced and Cigna cite the SPD and refer to it as the Plan.

The SPD explains what the Plan does not cover, including "charges for an Injury resulting from your employment or occupation."  Advanced's Appendix at 397. Occupational injury is defined as "an accidental bodily injury which arises from, or is complicated by, any employment or occupation for compensation or profit."  Cigna's Appendix at 852.  The Plan further states "[a] Covered Medical Expense shall mean any of the charges listed below . . . but only if such charges are Medically Necessary

and are not incurred in connection with an Occupational Disease or an Occupational Injury." *Id*. at 864. The Plan also states "[t]he Trustees will have full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust. Such authority includes . . . the power to: . . . Delegate its power and duties to other persons . . . including . . . professional plan administrators . . . ." *Id*. at 877-78. "[T]he Claims Administrator shall be a Plan fiduciary with full discretionary authority to interpret the Plan and resolve all questions, including questions of fact." *Id*. at 878. Thus, the power to determine whether claims were being made for occupational injuries–and ultimately whether a claim is payable–was delegated to Cigna.

In order to receive benefits under the plan, participants submit claims to Cigna and, unless otherwise specified, reimbursement for the service charge is paid directly to the participant.[1] *See* Advanced's Appendix at 422; Cigna's Motion at 4. Cigna processes the claim and sends the participant an Explanation of Benefits ("EOB") explaining whether the claim was paid, the reason for any non-payment, and other related information. *See* Cigna's Appendix at 411; Advanced's Appendix at 424. Similarly, health care providers (such as Advanced) are given an Explanation of Payment ("EOP") which explains a provider's review and appeal rights. *See* Cigna's

---

[1]     If the participant assigned the claim to the service provider, then the provider would submit the claim for payment to Cigna directly, as was done in this case.

Appendix at 431-438. The EOBs, EOPs, as well as the SPD, include information about appeal rights and procedures. See *id*. at 411-14. The "rights of review and appeal-for physician or health care provider" section of the EOP states "[i]f you have questions or disagree with the payment identified on this Explanation of Medical Payment Report, you may ask to have it reviewed." *Id*. at 437. The EOPs also contain a "rights of review and appeal - for employee" section, further explaining how to appeal a claim denial. *Id*. The EOPs reference the EOBs and SPD for specific appeal procedures. See *id*. It appears undisputed that Advanced never received the SPD directly from Cigna. *See* Advanced's Motion at 26-28; Brief in Opposition to Plaintiff's Motion for Summary Judgment ("Cigna's Response") (docket entry 239) at 11-12.

Participants may appeal claim denials and adverse claim determinations. Advanced's Appendix at 425. Appeals "must be received by the appropriate Cigna entity within 180 days of receipt of the denial notice." *Id*. According to the SPD, appeals are "reviewed and the decision made by someone not involved in the initial decision. Appeals involving a determination of Medically Necessary or clinical appropriateness will be considered by a health care professional." *Id*. The Plan also provides for a second level of review if the initial determination is upheld but involves medical judgment: "[i]f you are not fully satisfied with the decision and the appeal involves medical judgment, you may request that your appeal be referred to an

Independent Review Organization ('IRO')." *Id.* at 426. If the benefit determination

on appeal is adverse, the participant is provided with a notice that includes the

reasons for the adverse determination as well as information about the participant's

"right to bring an action under ERISA section 502(a)." *Id.* Participants must exhaust

all administrative remedies available under the plan before filing a suit in federal

court. See *id.* at 429-30.

### 3. *Advanced's Claims Under the Plan and Chronology of Events*

Advanced began treating retired NFL players in 2007. *See* Advanced's Motion

at 5; Cigna's Motion at 8. In August, 2014, one of Cigna's account representatives,

Patrick Gilroy ("Gilroy"), referred claims from Advanced to Cigna's Special

Investigation Unit ("SIU") because of what he believed were unusual practices,

specifically a large amount of medical imaging. *See* Advanced's Appendix at 534;

Cigna's Motion at 8. The SIU opened an investigation into Advanced on August 21,

2014. Advanced's Appendix at 534. Sean Petree ("Petree") was assigned as the

investigator. See *id.* at 532.

The case was originally referred to the SIU on suspicion that Advanced was

billing for unnecessary medical imaging. Petree, along with another investigator,

Angelica Branon ("Branon"), began the investigation and analysis on that basis. *See*

Cigna's Appendix at 462. Between December 2014 and February 2015, Petree and

Branon reviewed Advanced's billing records and the medical records of a small

sampling of patients. See *id*. On January 14, 2015, Branon noted in a "Pre-Case Investigative Summary of Findings" that, on the basis of her analysis, she recommended closing the case. See *id*. In that same note, however, she acknowledged that the data she reviewed "showed the NFL as the client with the highest amount paid." See *id*. Petree also conducted his own data queries in order to "determine if [Advanced] may be targeting a specific account." *Id*. at 1571. Petree concluded that "an abnormally high percentage of this provider's exposure was due to one account, in this particular case the NFL." *Id*.

On January 20, 2015, Petree and Branon held a meeting with Kate Shaker ("Shaker"), an employee of Health Care Fraud Shield ("HCFS"). The case was left open in part because Shaker agreed with Petree and Branon that Advanced was billing for an unusually high number of MRIs and x-rays per day of service. See *id*. at 462. Petree and Branon decided to have HCFS review the medical records. See *id*.

On February 23, 2015, Petree emailed his superior, Aneta Andros, stating in part "I reviewed the medical records for [Advanced] and found that they were quite comprehensive . . . The number of x-rays and MRI's ordered still looks very excessive . . . The vast majority of [Advanced's] exposure is due to the NFL, however these records appear to document (and potentially justify) each of the diagnostic services billed." Advanced's Appendix at 537.

HCFS delivered its review of Advanced's records in April 2015. *See* Cigna's

Appendix at 461, 464-65. In the report, HCFS noted, among other observations, that the injuries treated by Advanced "occurred while playing college and professional contact sports and are considered chronic, not acute." *Id*. at 464. This conclusion was based on the patients not "hav[ing] recent or significantly increased symptoms," and "neither medical record documents 'worsening' symptoms, or new injuries, again demonstrating chronic conditions." *Id*. The HCFS report also noted "[t]here are no documented 'course of action' or future treatment in any medical record, following the multiple tests." *Id*.

After receiving the report, Petree documented some of his "primary concerns," such as Advanced's treatment of chronic rather than new conditions, Advanced's "excessive" medical imaging, and no documentation for future treatment. *See* Cigna's Appendix at 461. Petree also documented that 87.2% of the plan participants Advanced saw did not reside in Illinois and that Advanced was providing the participants with disability ratings. See *id*. Based on this information, Petree made the following note: "Because many customers are former and/or current players, it is possible that they may seek out Advanced Physicians to receive a physician label of disabled." *Id*. From that point forward, it appears Petree suspected that participants were visiting Advanced to obtain a disability rating based on work-related injuries to support a claim for work-related disability benefits under another NFL plan.

In May 2015, the Advanced investigation was transferred to a different SIU

investigator, Greta Matus ("Matus"). See *id*. at 460, 1510-11. Around that time, Matus documented a discussion she had with Petree, noting "[t]here definitely may be an angle involving work related injuries which would not support billed services and charges . . . ." *Id*. at 460. On May 18, 2015, Cigna placed all claims made by Advanced under a new protocol whereby its claims were flagged and routed to the SIU. See *id*. at 460, 1563-64.

In either late May or early June of 2015, Cigna requested and received from Advanced the medical records of an additional thirty-six retired NFL players treated by Advanced. See *id*. at 459; Advanced's Motion at 13. The SIU had a Cigna medical director and physician, Dr. Daniel Nicoll ("Nicoll"), review the records to assess both medical necessity and the possibility that Advanced was treating work-related injuries. See *id*. at 1539-46; Advanced's Appendix at 555. In an email to Nicoll on July 17, 2015, Matus stated "in all 36 records, that diagnostic services are being sought for '. . . multiple injuries in the past while playing football causing chronic pain.' I do not believe that such a vague statement would substantiate an exclusion citing work related injuries . . . However, I would like your opinion on that aspect in addition to your clinical opinion." Advanced's Appendix at 553-54. After reviewing the records, Nicoll suspected that Advanced was in fact treating retired

players for work-related injuries.  *See* Cigna's Appendix at 1544-46.[2]  On July 24,

2015, Nicoll emailed Matus a summary of his conclusions, including "[w]hether the

services should be covered under workman's comp vs medical is a benefits question.

Given the type of injuries these men sustained, the issue of chronic brain injury post

concussion etc. the issue certainly is valid."  Advanced's Appendix at 553.  Nicoll also

concluded that the x-rays Advanced provided to participants were medically

necessary, but not the MRIs (with rare exceptions).  *See* Cigna's Appendix at 1549-

50.

Matus forwarded Nicoll's email to William Welch ("Welch"), an outside

attorney providing counsel, and Thomas Hixson ("Hixson"), the SIU director.  *See*

Advanced's Appendix at 555.  In her forward, Matus stated "Dr. Nicoll's review and

the fact that this plan does not require prior authorization I believe the allegation of

medically unnecessary diagnostic services is unsubstantiated."  *Id*.  She also

referenced her previous request for NFL records regarding disability claims "to

support the stance that these services fall under workers compensation . . ." and

---

[2]        Nicoll testified to the following in his deposition: "I reviewed one of the
medical records last week . . . it starts off in the history of the present illness . . . you
start off with the chief complaint and the history of the present illness.  The chief
complaint is he was an NFL football player.  I didn't say the chief complaint is he
sustained an automobile accident or he has a long history of rheumatoid arthritis . . .
So it would seem that the clinicians treating the patient . . . felt that the aches and
pains were related, at least from the chief complaint and history of present illness to
the NFL service . . . ."  Cigna's Appendix at 1544-46.

wanted to "touch base on those efforts." *Id.*

Around this same time, Matus began reaching out to Advanced, in particular to Debbie Vallandigham-Kokum ("Vallandigham-Kokum"), Advanced's billing manager. *See* Cigna's Appendix at 459. Internal Cigna records support, and Advanced does not contest, that at this time Matus and Vallandigham-Kokum discussed the SIU investigation of Advanced. See generally *id.* at 457-459. On July 9, 2015, Matus documented a phone call with Vallandigham-Kokum in which Matus averred that she "advised her that a Medical Director [at Cigna] had pointed out his opinion that these services are excluded under the plan due to them being work related injuries." *Id.* at 459. The following day, July 10, 2015, Matus documented that she received an email in which Vallandigham-Kokum forwarded "information [Vallandigham-Kokum] received from her Patient Advocate, Chris Carter." *Id.* Carter's email contained the following statement:

> It appeared the main topic in dispute [with Cigna] was "are these injuries work comp?" . . . Most, if not all, the chronic injuries we are assessing have never been reported or worked up . . . Unfortunately, when players are active, they are told to stay out of the training room if they want to remain employed . . . All of the former players that we see are coming to us for two reasons. They are seeking honest medical opinions of years worth of chronic injuries and traumas. All players need many forms of treatment, therapy and surgeries following retirement. Additionally, the objective medical data provides them a much greater chance to receive NFL disability money in line with the three forms of disability established by the NFL: Line of Duty, Neurocognitive, Total and Permanent. These benefits are based on whole person impairment ratings which we provide using our diagnostic tools.

-11-

*Id*. at 469.  According to the NFL Player Disability & Neurocognitive Benefit Plan, submitted as summary judgment evidence by Cigna, "Line of Duty" disability benefits are available to retired NFL players "who incurred a 'substantial disablement' . . . 'arising out of League football activities.'"[3] *Id*. at 1939.[4]

On August 19, 2015, having completed its review, Cigna issued a benefits determination letter addressed to Vallandigham-Kokum and Advanced.  *Id*. at 471-72.  In it, Cigna explained that after a "review of medical records for coding accuracy, medical necessity criteria review as well as a benefit review conducted by Cigna's Legal Department," Cigna had determined that Advanced was primarily billing "for services stemming from work-related injuries."  *Id*.  The letter went on to state "from this point forward, all procedure codes billed for NFL customers will be denied as work related unless demonstrated otherwise."  *Id*.  An internal Cigna document dated August 21, 2015 confirms that all claims made by Advanced were to be denied.  *See* Advanced's Appendix at 562; *see also* Cigna's Appendix at 1512-20.  Matus also

---

[3]     This plan goes on to define "arising out of League football activities" to mean "a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities."  Cigna's Appendix at 1941.

[4]     Cigna also contends that Matus and Vallandigham-Kokum had a conversation later that summer in which Vallandigham-Kokum corroborated that retired players were using Advanced's services to obtain disability benefits.  *See* Cigna's Motion at 13.  However, the existence and content of this conversation is contested by Advanced with admissible summary judgment evidence.

documented two phone conversations with Vallandigham-Kokum that took place on the 20th and 21st explaining the denial. *See* Cigna's Appendix at 457.

Close to a month later, on September 15, 2015, Advanced responded to the benefits determination through its attorney, Diane Frantell ("Frantell"). *See* Advanced's Appendix at 564-77. Frantell maintained that the determination was erroneous and potentially violated state and federal law. See *id*. Further, she requested that Cigna conduct individualized benefit determinations for each player and provide Advanced with the SPD. See *id*. at 567. Cigna responded through its attorney, William Welch ("Welch") on September 30, 2015. See *id*. at 578-80. In addition to disagreeing with Frantell's assertions that the determinations were erroneous, Welch indicated that Cigna would not provide the SPD because Advanced had not provided assignments from the participants authorizing such disclosure to Advanced. See *id*. at 579. Welch ended the letter by directing Frantell to "other potential avenues of reimbursement" including the NFL Player Care Foundation, the Players Trust, and the NFL Former Player Life Improvement Plan. See *id*. at 579-80. After Frantell sent copies of the assignments to Welch, Welch indicated that Cigna still would not provide the SPD because "neither Cigna nor the Plan have received the Cigna customer's written authorization to release such a document . . . the assignments did not assign the participants' right to obtain the [SPD] to your client." *Id*. at 581-82. Welch also cited a Department of Labor web page stating "[a]n

assignment of benefits . . . is generally limited to assignment of the claimant's right to receive a benefit payment . . . [t]ypically, assignments are not a grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination under a plan." *Id.*

This back and forth continued through December of 2015. Frantell's letters often included citations to statutory, regulatory, and case law authority, as well as providing supplemental documentation related to the claims. *See* Cigna's Appendix at 481-87. There is no record evidence that Advanced provided specific written authorizations from participants for Advanced to receive the SPD. Some of Welch's letters to Frantell ended with the following statement: "[t]o be clear, nothing in this letter should be construed to be a review or determination of any particular claim under 29 CFR § 2560.503-1." *See e.g.*, Advanced's Appendix at 583-84; Cigna's Appendix at 488-92. None of Frantell's letters expressly represented to be appeals, and the September 15th letter stated that it was a request for information "so that we can properly appeal these alleged Benefit Determinations." *Id.* at 569; *see* Cigna's Appendix at 481-87.

Advanced filed suit in June of 2016 after Frantell's correspondence with Welch did not prompt Cigna to reverse its decision. To date, Cigna maintains the same protocol for claims made by Advanced. In his deposition, Petree testified that Advanced is the only health care provider flagged with the specific protocol that

Cigna employs for Advanced.  *See* Advanced's Appendix at 1418.  Neither Advanced

nor any participants have filed an appeal with Cigna through either the internal

appeal process or the IRO process.  *See* Cigna's Appendix at 1577-78.

B.  Procedural Background

The parties have been litigating this case for nearly five years.  During that

time, the parties have filed several motions and conducted extensive discovery.  Full

recitations of the procedural background of this case are provided in the court's

memorandum opinions and orders issued on October 27, 2017 (docket entry 80),

March 27, 2018 (docket entry 87), January 3, 2020 (docket entry 194), and August

14, 2020 (3:19-CV-2432-G, docket entry 54) (*Advanced II*).

Since that time, the parties have concluded discovery and filed the dispositive

motions now before the court.  Cigna filed its motion for summary judgment on

September 21, 2020.  *See* Cigna's Motion.  Advanced filed its motion the following

day.  *See* Advanced's Motion.  Advanced responded to Cigna's motion on October 19,

2020.  *See* Plaintiff's Response to Cigna's Motion for Summary Judgment

("Advanced's Response") (docket entry 237).  Cigna filed its response to Advanced's

motion the following day.  *See* Cigna's Response.  Cigna also filed its motion to strike

on October 19, 2020.  *See* Motion to Strike Portions of Advanced Physicians, S.C.'s

Summary Judgment Evidence and Brief in Support ("Motion to Strike") (docket

entry 235).  Both parties replied to each others' respective responses on November 2,

2020.  *See* Plaintiff's Reply in Support of Its Motion for Summary Judgment

("Advanced's Reply") (docket entry 242); Reply in Support of Defendants' Motion

for Summary Judgment (Cigna's Reply) (docket entry 241-1).  Advanced responded

to Cigna's motion to strike on November 9, 2020.  *See* Plaintiff's Response to

Defendant's Motion to Strike ("Motion to Strike Response") (docket entry 245).

Cigna replied on November 23, 2020.  *See* Reply in Support of Motion to Strike

Portions of Advanced Physicians, S.C.'s Summary Judgment Evidence and Brief in

Support (docket entry 246).  The motions are therefore fully briefed and ripe for

decision.[5]

## II.  ANALYSIS

### A.  Summary Judgment Legal Standard

Summary judgment is proper when the pleadings, depositions, admissions,

disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  FED. R. CIV. P. 56(a), (c)(1).[6]  A fact is material if the governing substantive

law identifies it as having the potential to affect the outcome of the suit.  *Anderson v.*

---

[5]     The court appreciates the parties' patience as the court worked through a voluminous record to decide these motions.

[6]     Disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in its favor. *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response

to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## B. Application

The underlying facts of this case, outlined above, are largely undisputed by the parties. The parties instead dispute the legal significance of these facts. "[I]f the parties agree on the facts . . . summary judgment would be appropriate. The fact that difficult questions of law exist or that the parties differ on the legal conclusions to be drawn from the facts is not in and of itself a ground for denying summary judgment . . . ." 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2725 (4th Ed. Updated 2021). "Finally, a dispute over the legal inferences to be drawn from the facts will not preclude summary judgment." *Federal Trade Commission v. Hughes*, 710 F.Supp. 1524, 1526 (N.D. Tex. 1989) (Fish, J.) (citing *Sagers v. Yellow Freight System, Inc.*, 529 F.2d 721, 728 n. 13 (5th Cir. 1976); *International Association of Machinists and Aerospace Workers, District 776 v. Texas Steel Company*, 538 F.2d 1116, 1119 (5th Cir. 1976), *cert. denied*, 429 U.S. 1095, (1977)). Therefore, summary judgment on the record as it stands is appropriate in this case.[7]

---

[7]        "Because ERISA litigation is highly oriented to plan documents, reports and other papers, lawsuits related to benefit plans are typically document intensive. For that reason and also because legal rights under the Act are usually based on documents, ERISA lawsuits typically reach judgment without the need for a trial." 2 Lee T. Polk, *ERISA Practice and Litigation* § 11:72 (December 2020 Update).

The parties also agree on the structure of Section 1132(a) ERISA doctrine. Advanced has to establish that 1) it has ERISA standing, 2) it has exhausted its administrative remedies, and 3) that Cigna abused its discretion in denying Advanced's claims. See generally *North Cypress Medical Center Operating Company, Ltd. v. Cigna Healthcare*, No. 4:09-CV-2556, 2016 WL 9330500 (S.D. Tex. Sept. 28, 2016), *aff'd*, 952 F.3d 708 (5th Cir. 2020), *cert. denied*, ___ U.S. ___, 141 S. Ct. 1053 (2021); Cigna's Motion; Advanced's Motion.

## 1. *ERISA Standing*

For the sake of deciding these motions, the court will assume, *arguendo*, that Advanced has standing to pursue its claims.[8]

## 2. *Exhaustion*

"[E]xhaustion of administrative remedies is a prerequisite to an ERISA action in federal court." *Swanson v. Hearst Corporation Long Term Disability Plan*, 586 F.3d 1016, 1018 (5th Cir. 2009) (citing *Bourgeois v. Pension Plan for the Employees of Santa Fe International Corporations*, 215 F.3d 475, 479 (5th Cir. 2000)); *Heimeshoff v. Hartford Life & Accident Insurance Company*, 571 U.S. 99, 105 (2013) ("The courts of appeals have uniformly required that participants exhaust internal review before

---

[8]     The court also notes that the arguments regarding standing appear to present genuine factual questions. See *North Cypress*, 2016 WL 9330500, at *7-8 (explaining that a genuine dispute of fact is easily created under the standing prong of analysis.).

bringing a claim for judicial review under § 502(a)(1)(B).").  "This requirement is not one specifically required by ERISA, but has been uniformly imposed by the courts in keeping with Congress' intent in enacting ERISA."  *Hall v. National Gypsum Company*, 105 F.3d 225, 231 (5th Cir. 1997).  The exhaustion requirement operates as an affirmative defense.  See *Crowell v. Shell Oil Company*, 541 F.3d 295, 308-309 (5th Cir. 2008).  Advanced must have either exhausted its administrative remedies under the Plan or satisfied an exception to the exhaustion requirement.

Advanced concedes that it did not exhaust the formal appeals process available under the plan.  *See* Advanced's Motion at 24-29; Advanced's Response at 11-20. Instead, Advanced posits the following arguments for excusing the exhaustion requirement: 1) that the Frantell/Welch correspondence constituted an appeal, 2) futility of any appeal, 3) that Cigna failed to substantially comply with relevant regulations, and 4) that Advanced was denied meaningful access to the appeals process.  See *id*.

a.  *Correspondence with Welch*

Advanced believes it "did exhaust its administrative remedies through its correspondence and evidence submitted to Welch in the period after Cigna issued its denial of benefits letter . . ." and that because Cigna "refused to provide the SPD, it was reasonable for Advanced to assume based upon Welch's letter that Advanced had pursued the matter as far as it could."  Advanced's Motion at 25.  This argument is

-20-

unpersuasive upon scrutiny.

In support of its argument, Advanced cites an out-of-circuit decision and a district court decision. *See* Advanced's Reply at 5-6. These decisions do not support Advanced's position, however. They are examples of the recognized "meaningful access" exception, not an "attorney correspondence" exception. See *Bernstein v. Citigroup Inc.*, No. 3:06-CV-209-M, 2006 WL 2329385, at *2-3 (N.D. Tex. July 5, 2006) (Lynn, J.) (citing *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846-47 (11th Cir. 1990)). As explained further below, Advanced cannot satisfy the meaningful access exception.

This leaves Advanced's argument with no cited case law support. The court cannot declare it "fair" or "reasonable" for Advanced to dodge the exhaustion requirement based upon correspondence without precedential support. "Allowing informal attempts to substitute for the formal claims procedure would frustrate the primary purposes of the exhaustion requirement." *Moss v. Unum Group*, 638 Fed.Appx. 347, 350 (5th Cir. 2016) (quoting *Bourgeois*, 215 F.3d at 480 n.14).

If Advanced is relying on the "limited estoppel remedy" recognized in *Bourgeois*[9], this argument fails. In *Bourgeois*, the Fifth Circuit carved out a "limited estoppel remedy" when "the lack of information and the behavior of various officials of the company [leads the claimant] on a wild goose chase, effectively extinguishing

---

[9]        See *Bourgeois*, 215 F.3d at 477.

[their] time to apply for benefits." *Bourgeois*, 215 F.3d at 481. More specifically, "a

claimant [must rely] to his detriment on the words and actions of high-ranking

company officers who purport to negotiate benefit decisions without actual

authority." *Id*. at 481-82. In *Bourgeois*, the defendant "engaged [the claimant] in

negotiations regarding his benefits without ever referring him to the proper channels

before issuing what appeared to be a final denial." *Id*.[10] In other words, Advanced

must show it was reasonably misled by Welch's correspondence into believing it was

appealing the benefit determination and had been issued a final determination.

Advanced has not made this showing.

First, Welch's letters dated November 5, 2015, December 21, 2015, and

January 29, 2016 ended with the following disclaimer: "To be clear, nothing in this

letter should be construed to be a review or determination of any particular claim

under 29 CFR § 2560.503-1. The information contained herein should be

considered part of the administrative record." *See e.g.*, Advanced's Appendix at 583-

88; Cigna's Appendix at 490-92. It strains credulity to suggest that the phrase

"nothing in this letter should be construed to be a review or determination" is

actually "negotiat[ing] benefit decisions without actual authority" or "engag[ing] . . .

in negotiations regarding [Advanced's] benefits." By including these disclaimers,

---

[10]    The *Swanson* case, cited by both parties, is an application of the estoppel
rule in *Bourgeois*. See *Swanson*, 586 F.3d at 1019.

Welch was explicitly warning Advanced that whatever it thought it was accomplishing through the correspondence, it was neither appealing nor negotiating benefits.

Advanced also cites these letters, especially the December 21st letter, to argue "it was reasonable for Advanced to rely on Welch's statement that this was the 'Plan's final decision.'" Advanced's Response at 17. On the face of the letters, however, it was not. By explicitly stating that the correspondence did not constitute a review, Welch was alerting Advanced that this "final decision" was a final decision regarding the initial benefit determination, but that a *separate* appeal process was available for further review of that determination. Advanced's argument in effect removes Welch's statement from its context.

Advanced's argument–that this statement, combined with the fact that it was never given the SPD, makes its belief reasonable–is unavailing for the same reasons. The positive implication of Welch's disclaimer is that there is a review process in accordance with 29 C.F.R. § 2560.503-1. Advanced can reasonably assert only that it did not know the specific procedures enumerated in the SPD, not that it was reasonable to think there were none at all. In sum, the correspondence Advanced relies on actually cuts in the opposite direction.

In addition, the Frantell/Welch correspondence suggests that Advanced actually *knew* Welch's December 21st letter was not a final decision. Frantell's

immediate response, dated December 22nd, again "renew[s] [Advanced's] request for the Summary Plan Descriptions . . . ." Cigna's Appendix at 484. As a reminder, Advanced's previous requests were made in order to "properly appeal these alleged Benefit Determinations." Advanced's Appendix at 569. Advanced's argument that this correspondence was an exhaustion of their remedies thus raises the following conundrums. Why would Advanced again request materials regarding appeal procedures if it believed it was appealing through its correspondence with Welch? Similarly, why would Advanced request the materials if it believed a "final decision" had already been made? Frantell's letter does not indicate a separate reason for requesting the SPD. Thus, the logical conclusion is that Advanced in fact knew it was not appealing.

Next, the correspondence falls short of the "wild goose chase" from *Bourgeois*. See *Bourgeois*, 215 F.3d at 481. It is undisputed that Advanced was not given a copy of the SPD despite having requested it several times through the Frantell/Welch correspondence. Every time Welch denied these requests, he did so for the same reason: the assignments provided by Advanced did not specifically assign to Advanced rights to plan information. *See e.g.*, Advanced's Appendix at 581-82. Welch's reasons never changed. Despite the fact that Welch twice explained what Advanced needed to do and cited Department of Labor regulations in support of his position, Advanced did not produce assignments with the specifically tailored

language.  *See* Advanced's Appendix at 578-82.  Unlike the situation in *Bourgeois*, Welch was not playing a shell game with Frantell.  The plaintiff in *Bourgeois* complied with directions only to be told of new ones until the plan had "effectively extinguishing his time to apply for benefits."  *Bourgeois*, 215 F.3d at 481. Here, the proverbial goalposts never moved.  Welch's directions remained consistent, backed up by authority.  Advanced simply never complied with Welch's initial, unchanged directions.  See *Memorial Hermann Health System v. Southwest LTC, Limited Employee Benefits Plan*, 683 Fed.Appx. 274, 275 (5th Cir. 2017) ("Memorial failed to provide Meritain with proof of an authorization or assignment from C.W. . . . When the Plan Administrator is clearly advising a would-be claimant of a valid task it must perform so that a claim may be processed, there is no interference with access.").  Also, "[u]nlike *Bourgeois*, [Advanced] was represented by legal counsel during [its] efforts to reinstate [its] denied benefits."  *Swanson v. Hearst Corporation Long Term Disability Plan*, No. H–08–213, 2009 WL 361469, at *6 (S.D. Tex. Feb. 11, 2009), *aff'd*, *Swanson*, 586 F.3d 1016; see also *Shepherd v. Worldcom, Inc.*, No. H-03-5292, 2005 WL 3844069, at* 8 (S.D. Tex. Sep. 9, 2005) ("Shepherd . . . also was represented by his own legal counsel from the date that his eligibility to participate in the Plan was discontinued[.]").  In sum, these facts resemble nothing like the egregious run-around

in *Bourgeois*.[11]

Advanced also argues "[t]he cases cited by Cigna to the effect that a letter from a lawyer to the Plan is insufficient to constitute an appeal are distinguishable." Advanced's Response at 17. This is true, Advanced argues, because the correspondence in *Swanson* and *Holmes*–the cases cited by Cigna–were merely expressions of an intent to appeal, whereas Advanced "provided arguments and evidence" why the benefits decision was wrong. See *id*. Frantell's letters, however, suggest otherwise. The letter with by far the most "argument and evidence," the September 15th letter, also states in bold lettering, "[w]e hereby repeat our request for [the SPD] so that we can properly appeal these alleged Benefit Determinations." Advanced's Appendix at 569. In other words, this letter was an expression of an intent to appeal. And, Frantell repeated this request as late as December 22nd. *See* Cigna's Appendix at 484. The court declines to turn what are facially expressions of an intent to appeal into actual appeals. Cf. *Simmons v. Liberty Life Assurance Company of Boston*, No. 4:11–CV–04609, 2013 WL 2482739, at *5 (S.D. Tex. June 10, 2013) ("In *Duncan*, the claim administrator was found to have abused his discretion in

---

[11] It is also worth noting that in his September 30th letter to Frantell, Welch listed three different funds that could possibly reimburse Advanced's claims. *See* Advanced's Appendix at 579-80. In reality, Welch was actually trying to *help* Advanced find a means of reimbursement. This is again in sharp contrast to *Bourgeois* where the claimant was never referred to the proper channels. See *Bourgeois*, 215 F.3d at 482.

treating a preliminary letter from a claim as an appeal—precisely what Plaintiff is asking of the Court in this case. The *Duncan* court found that the plaintiff's 'letter clearly indicates a future intention to file an appeal and requests information to which Duncan was entitled in order to pursue her appeal. This is insufficient to start the appeal process.'") (quoting *Duncan v. Assisted Living Concepts, Inc.*, No. 3:03-CV-1931-N, 2005 WL 331116, at *3 (N.D.Tex., Feb. 10, 2005) (Godbey, J.).

Lastly, the court finds it doubtful whether the language from *Swanson* Advanced relies on would be good law in the way that Advanced uses it. Advanced's argument implies that the correspondence, standing on its own, could constitute an appeal. That would be in direct conflict, however, with other Fifth Circuit case law. See e.g., *Moss*, 638 Fed.Appx. at 350 (5th Cir. 2016) ("Allowing informal attempts to substitute for the formal claims procedure would frustrate the primary purposes of the exhaustion requirement."); see also *Green v. Union Security Insurance Company,* No. 4:11–CV–860–A, 2013 WL 300918, at *4 (N.D. Tex. Jan. 25, 2013) (McBryde, J.) ("Strict compliance with the plan's procedures for claims, including all internal appeals processes, is required, as 'allowing informal attempts to substitute for the formal claims procedure would frustrate the primary purposes of the exhaustion requirement.'"). Further, it would create the paradox noted by Judge Godbey in the *Duncan* case. See *Duncan*, 2005 WL 331116, at *3 (noting that informal correspondence "improperly truncate[s] the appeal process."). Also, the language

Advanced relies on from *Swanson* and *Holmes* were hypothetical counter-factuals. Thus, the court reads them to stand for the proposition, if at all, that correspondence might *initiate* an appeal, but not perfect an appeal.

### b. *Futility*

Advanced also argues that it is excused from exhausting its administrative remedies because it would have been futile to do so. *See* Advanced's Response at 18-20; Advanced's Motion at 25. Futility is a recognized exception in the Fifth Circuit. See *McGowin v. ManPower International, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004). "A failure to show hostility or bias on the part of the administrative review committee is fatal to a claim of futility." *Id*. In effect, Advanced must show "a 'certainty of an adverse decision.'" *Bourgeois*, 215 F.3d at 479 (quoting *Communications Workers of America v. AT&T*, 40 F.3d 426, 433 (D.C. Cir. 1994)). Advanced, however, has failed to do so as a matter of law.

It is undisputed that an appeal would be heard by "someone not involved in the initial decision." Advanced's Appendix at 425. This fact alone may demonstrate, as a matter of law, that an appeal would not have been futile. Cf. *Communications Workers of America*, 40 F.3d at 433 (noting that, even when the reviewing body is composed of company management, futility will not be assumed). Simply put–and without evidence of who this person would be or their potential biases–fresh eyes means at least the possibility of a reversal.

That leads to perhaps the defining flaw of Advanced's argument: the lack of any evidence of futility. To reiterate, it is undisputed that an appeal would be heard by "someone not involved in the initial decision." Advanced's Appendix at 425. Advanced makes no reference to or any argument about this fact. In one sense, this is a puzzling omission given Advanced's burden to demonstrate this person's hostility or bias, or that they were certain to render an adverse decision. See *Bourgeois*, 215 F.3d at 479; *McGowin*, 363 F.3d at 559. On the other hand, it is an obvious omission because Advanced never tried to appeal either the interpretation of the plan or any of the individual claims. Petree testified at his deposition that Advanced could have won individual appeals if it "demonstrate[d] on appeal that the injury is . . . not work related." Advanced's Appendix at 1420. Advanced did not. By not appealing, Advanced foreclosed the possibility of compiling a record of rejections or otherwise biased behavior that could have demonstrated futility. See *Communications Workers of America*, 40 F.3d at 433 ("Because the Plan's final review authority, the Benefits Committee, never had an opportunity to render a final determination on appellees' claims, we fail to see any basis for finding that an unfavorable decision by that Committee was a foregone conclusion.").

The evidence that Advanced does cite is unpersuasive. Advanced first points to the shifting internal protocols Cigna used to process Advanced's claims after the benefits determination. *See* Advanced's Response at 19. It is unclear to the court

what relevance these protocols have on the question of whether an appeal would be futile. In the benefits determination, Cigna told Advanced that it would presume any claim made by Advanced was for work-related care. *See* Cigna's Appendix at 471-72. It logically follows that Cigna would develop a protocol to implement that presumption. That the protocol was amended twice seems inconsequential to the court. More to the point, these are protocols for handling *initial* claims by Advanced. They are *not* protocols for handling appeals. It requires too many leaps (unwarranted on this record) to conclude that initial claims handling protocols alone prove "a 'certainty of an adverse decision . . .'" on appeal. *Bourgeois*, 215 F.3d at 479. This amounts to "mere 'speculation and conjecture.'" *Gibson v. Old Town Trolley Tours*, 160 F.3d 177, 181 (4th Cir. 1998).

Advanced next relies on the deposition testimony of Petree to show that an appeal would have been futile. *See* Advanced's Response at 19 ("Cigna's corporate representative, Sean Petree, testified that he is unaware of a way Advanced could submit a claim that would not be denied as work related . . . The only example Mr. Petree could give where Advanced might get paid is if the Plan instructed Cigna to pay the claim."). This argument commits the same basic error as the previous one: it conflates the initial handling of a claim with the appeal process. It also misleadingly characterizes Petree's testimony. Petree's deposition actually reads as follows: "Q: . . . Are you aware of any claim that Advanced could file with regard to the plan where

it would not be denied as work related?  A: No.  But the provider would have the opportunity to appeal if they disagree with that determination."  Advanced's Appendix at 1420 at 158:8-14.  In other words, the testimony Advanced relies on actually *confirms* that appealing was a viable route rather than proving futility.  In addition, Petree went on to testify–and Advanced does not dispute–that initial claims were in fact paid after the August 2015 benefits determination.  *See* Cigna's Appendix at 1636 ("My understanding that in practice, that's not how it happened, because I recall that there were claims that got paid that were not work related and still medically necessary.").  That fact alone may be fatal to Advanced's argument.  See *North Cypress Medical Center Operating Company, Ltd. v. Cigna Healthcare*, No. 4:09-CV-2556, 2018 WL 3738086, at *11 (S.D. Tex. Aug. 7, 2018) ("The recently-produced case notes do not alter the fact that–as Cigna demonstrated at summary judgment–NCMC could not show certainty of denial because Cigna was willing to grant some appeals and modify some payments."), *aff'd*, 952 F.3d 708 (5th Cir. 2020), *cert. denied*, ___ U.S. ___, 141 S.Ct. 1053 (2021).  Advanced's argument asks the court to do precisely what the Supreme Court has warned courts not to do on summary judgment, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Advanced's final argument is again unavailing. "Here, the benefit determination was made by Cigna's legal team in conjunction with the Plan's lawyers." Advanced's Motion at 25. The court does not understand what this means or its significance. If the suggestion is that the Plan was directing Cigna to deny Advanced's claims, this assertion is again "blatantly contradicted by the record."[12] *See* Cigna's Response at 11 (citing multiple witness's deposition statements to the contrary). If the argument is that futility can be established when a determination is influenced by internal legal teams or an interpretation of a plan is preclusive, case authority is against it. "The permanent block and letter to physicians, by themselves, would also be insufficient to show futility. That is because they are evidence of the company's position, not the review committee's interpretations." *Encompass Office Solutions, Inc. v. Louisiana Health Service & Indemnity Company*, No. 3:11–CV–1471–P, 2013 WL 12310676, at *15 (N.D. Tex. Sept. 17, 2013) (Solis, J.) (citing *Bourgeois*, 40 F.3d at 479–80 ("[A] company's preclusive interpretation . . . does not establish that the actual [review] Committee would not have considered his claim.")); *Shepherd*, 2005 WL 3844069, at *6 ("In other words, the legal department's letter [denying claim for ERISA benefits] constitutes no evidence that the Plan's Subcommittee was biased against or hostile toward Plaintiffs or that it would not have considered a claim regarding the proper construction of the Plan.") (citing *McGowin*, 363 F.3d at

---

[12]      *Scott*, 550 U.S. at 380.

559-60).

In sum, the only evidence and arguments Advanced marshals for futility are legally insufficient and/or factually inapposite. Therefore, Advanced is unable, as a matter of law, to establish futility.

c. *Substantial Compliance*

Advanced next argues that Cigna "failed to substantially comply with the regulations such that Advanced is deemed to have exhausted its administrative remedies." Advanced's Response at 12. Indeed, the Code of Federal Regulations provides:

> [I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l)(1). The Fifth Circuit has held, however, that plan administrators need only "substantially comply" with the regulations. See *Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 257 (5th Cir. 2005). "'[T]echnical noncompliance with ERISA procedures will be excused so long as the purpose of section 1133 has been fulfilled . . .' [which is] 'to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial.'" *Lafleur v. Louisiana Health Service & Indemnity Company*, 563 F.3d 148,

154 (5th Cir. 2009) (internal citations omitted). "The 'substantial compliance' test also 'considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances.'" *Id*. (internal citations omitted).

Advanced makes three intertwined arguments. First, Advanced argues that Cigna did not substantially comply by failing to provide Advanced with a copy of the SPD. *See* Advanced's Response at 14-15; Advanced's Motion at 25-29. Second, Advanced argues that Cigna's benefits determination and other communications did not provide adequate information. See *id*. Third, Advanced argues that Cigna "failed to substantially comply with the timing of notification of benefits determinations found in 29 C.F.R. § 2560.503-1(f)(2)(iii)(B) . . . [and] failed miserably to respond with benefit determinations on Advanced's claims for anywhere from three months to over three years." Advanced's Response at 16. The undisputed facts of this case, however, establish that Cigna did substantially comply with the regulations.

Contrary to Advanced's assertions, Cigna was under no obligation to provide it with a copy of the SPD. The plain language of Section 1024(b)(4)[13] does not include providers in Advanced's shoes: "[t]he administrator shall, upon written request of any *participant or beneficiary*, furnish a copy of the latest updated summary, plan

---

[13]    The statutory provision governing Cigna's disclosure obligations. *See* 29 U.S.C. § 1024(b)(4).

-34-

description, and the latest annual report, any terminal report, the bargaining

agreement, trust agreement, contract, or other instruments under which the plan is

established or operated." 29 U.S.C. § 1024(b)(4) (emphasis added). Advanced is

neither a participant nor a beneficiary; it is an assignee. When presented with

identical arguments, courts in this circuit have rejected the idea that assignees like

Advanced come within the scope of section 1024(b)(4)'s disclosure obligation. See

*North Cypress*, 2016 WL 9330500 at *10; *Outpatient Specialty Surgery Partners, Ltd. v.*

*Unitedhealthcare Insurance Company*, No. 4:15-CV-2983, 2016 WL 3467139, at *7

(S.D. Tex. June 24, 2016) (citing *Bartling v. Fruehauf Corporation*, 29 F.3d 1062, 1072

(6th Cir. 1994)[14]).

As in *Outpatient Specialty*, "[Advanced] has not given the Court any reason to

depart from [*Bartling*]." *Id*. Advanced's sole cited authority, *Parton v. United States*

*Life Insurance Company,*[15] *see* Advanced's Response at 15; Advanced's Motion at 28, is

---

[14] The *Bartling* court was applying a Department of Labor advisory opinion which states, in pertinent part, "[a]bsent [an express authorization by participants to assignees], it is the Department's view that a plan is not required by section 104 of ERISA to provide such information to persons who are neither participants nor beneficiaries." The court then stated, "in interpreting § 1024(b)(4), we are obliged to accord great deference to DOL interpretations . . . The plain language of the DOL Advisory Opinion Letter refers broadly to *all* 'persons who are neither participants nor beneficiaries' . . . Following the DOL's guidance, then, we hold that Defendants were not obliged to disclose any documents to [assignees] without written authorization from Plaintiffs or their beneficiaries." *Bartling*, 29 F.3d at 1072 (emphasis in original) (internal citations omitted).

[15] No. 2:13-CV-203-J, 2014 WL 12531459 (N.D. Tex. Aug. 12, 2014) (Robinson, J.).

inapposite and actually proves the rule. The third sentence of that opinion reads, "Plaintiff Kristin Parton is the *sole beneficiary* of both a basic and a supplemental life insurance policy that her husband, Jeffrey Parton, obtained through his employer." *Parton*, 2014 WL 12531459, at *1 (emphasis added). The plaintiff in *Parton* was a beneficiary, not an assignee. *Parton* undermines Advanced's argument. Thus, Advanced's argument that Cigna breached its purported obligation to provide the SPD, thereby excusing Advanced's exhaustion requirement, fails as a matter of law.

The court also concludes that Cigna's August 19, 2015 benefit determination, in conjunction with the EOPs,[16] substantially complies with applicable regulations as a matter of law. The regulations obligated Cigna to communicate the following information: 1) "The specific reason or reasons for the adverse determination;" 2) "Reference to the specific plan provisions on which the determination is based;" 3) "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" 4) "A description of the plan's review procedures and the time limits applicable to such procedures . . . a statement of the claimant's right to bring a civil action under section 502(a) of the Act . . . ;" and 5) "If an internal rule, guideline, protocol, or other similar criterion was relied upon . . . either the specific rule,

---

[16]     As a reminder, the court must consider "all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." *Lafleur*, 563 F.3d at 154.

guideline, protocol, or other similar criterion; or a statement that such a rule,

guideline, protocol, or other similar criterion was relied upon . . . and that a copy of

such rule, guideline, protocol, or other criterion . . . will be provided free of charge . . .

upon request . . . ." 29 C.F.R. § 2560.503-1(g)(1)(i-v). Contrary to Advanced's

conclusory arguments, Cigna's communications with Advanced substantially

complied with the regulations.

The second sentence of the benefit determination states "[t]he review

identified that [Advanced] bills for services that fall outside the healthcare benefit

plan for NFL players." Cigna's Appendix at 471. In other words, a "specific reason .

. . for the adverse determination." 29 C.F.R. § 2560.503-1(g)(1)(i). The third

paragraph of the determination states "[t]he Plan does not cover work-related

expenses," and then quotes several portions of the Plan itself. *See* Cigna's Appendix

at 471. This satisfies the requirement to "[r]eference to the specific plan provisions

on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1)(ii). The fourth

paragraph detailed how Cigna came to its conclusion, satisfying both subsections (i)

and (v)(A). *See* Cigna's Appendix at 472. The EOPs informed Advanced of the 180

day time limit to appeal, the information required to properly appeal, and statements

about participants rights under section 502(a) and the right to receive relevant

documents. See *id*. at 431. Further, subsection (iii) appears inapplicable. Cigna's

benefit determination was based not upon a lack of information, but rather because

Advanced was seeking payment for services outside the scope of the Plan. Even if it were applicable, the benefit determination informed Advanced that it could be paid by demonstrating that services were for non work-related injuries. See *id*. at 472.

Arguably, the only piece of information missing was "[a] description of the plan's review procedures . . . ." 29 C.F.R. § 2560.503-1(g)(1)(iv). However, and as Advanced acknowledges, the EOPs did reference the plan materials for further instructions. *See* Advanced's Response at 14. For reasons that the court will address below, Advanced had constructive access to these materials.[17] In sum, Cigna's communications with Advanced satisfied every requirement of the regulation. Thus, not only did Cigna "substantially comply" with the regulations, it fully complied with the regulations.

Even if the court were to assume, *arguendo*, that Cigna did not fully comply, the undisputed facts establish, as a matter of law, that Cigna "substantially complied." In the benefit determination letter alone, Advanced was given the reason for the adverse determination, how Cigna arrived at that conclusion, and quotations from the Plan (or SPD) that enumerated the relevant limitation. *See* Cigna's Appendix at 471-72. This information "afford[ed] [Advanced] an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." *Lafleur*, 563 F.3d at 154. The court thus concludes that Cigna, at the very least,

---

[17]     Nor was Cigna obligated to provide Advanced with a copy of the SPD.

"substantially complied" with the requirements of 29 C.F.R. § 2560.503-1(g)(1) as a matter of law.

Finally, the court concludes that Advanced's timing argument also fails. The only competent summary judgment evidence submitted by Advanced is the time that elapsed between when the SIU began its investigation and when Cigna issued the August 19, 2015 benefit determination.[18] The undisputed facts establish that

_____

[18]     The court grants Cigna's motion to strike the summary chart entitled "Sample of Cigna's Response Time After Receiving Advanced Physicians Claims" attached to Vallandigham-Kokum's declaration as either exhibit 36 or 37 (Advanced's Appendix pages 31-36). Cigna objected to the use of this chart, arguing "the documents underlying the purported summary have not been produced and are not in the Appendix . . . [Advanced] has not made available the underlying documents that would support [the chart]." Motion to Strike at 7. The burden then shifted to Advanced to "show that the material is admissible as presented or to explain the admissible form that is anticipated." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 539 (4th Cir. 2015) (quoting FED. R. CIV. P. 56 Advisory Committee's Note).

    The chart is plainly a Rule 1006 summary chart. *See* FEDERAL RULES OF EVIDENCE Rule 1006. The rule states, in part, "[t]he proponent may use a summary, chart . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying . . . by other parties at a reasonable time and place . . . ." *Id*. The Fifth Circuit has upheld the use of such a chart at the summary judgment stage despite an objection, stating "[the proponent] . . . advised the district court that 'the supporting documentation for the summaries . . . were too voluminous to reproduce herewith, *but will be made available to the Court and the parties upon request.*" *In re Complaint of Taira Lynn Marine Limited Number 5 L.L.C.*, 420 Fed.Appx. 330, 336 (5th Cir. 2011) (emphasis added). Though a simple obligation, Advanced failed to satisfy this burden. Its argument that "[t]he spreadsheet referred to reflects the columns described in the declaration" is irrelevant. Motion to Strike Response at 5. Advanced needed to respond to the objection with some indicia of the chart's ultimate admissibility. It could have attached some of the underlying documentation, showed that it produced the documents to Cigna, or just

between May and August of 2015, Cigna informed Advanced of the investigation, kept Advanced apprised of its progress, requested information, and ultimately issued a determination. Specifically, in either May or June of 2015, Matus reached out to Vallandigham-Kokum and informed her that Advanced's claims were being audited. *See* Advanced's Appendix at 4-5; Cigna's Appendix at 459. Later on in June, Matus requested medical records of 36 retired players for review. Advanced's Appendix at 5. Matus and Vallandigham-Kokum continued to correspond into July and August, including when Vallandigham-Kokum forwarded the email from Advanced's Patients Benefits Coordinator Chris Carter. *See* Cigna's Appendix at 458-59; Cigna's Motion at 12-13. Finally, Cigna issued the benefit determination on August 19.

The Fifth Circuit has recognized a flexible approach in evaluating the timeliness of benefit determinations adopted in sister circuits. See *Theriot v. Building Trades United Pension Trust Fund*, No. 20-30126, 2021 WL 955152, at *8 n.10 (5th Cir. Mar. 12, 2021) ("Courts have only excused plan administrators from ERISA's strict deadlines in the limited instance where the plan administrator had engaged in 'ongoing' information gathering with the claimant.") (citing *Jebian v. Hewlett-Packard*

_____

confirmed that the documents would be available for inspection, as in *Taira Lynn Marine*. See *Encompass Office Solutions, Inc. v. Cigna*, No. 3:11-CV-02487-L, 2017 WL 3268034, at *9 n.4 (N.D. Tex. July 31, 2017) (Lindsay, J.) (citing *Chapman v. A.S.U.I. Healthcare and Development Center*, 562 Fed.Appx. 182, 186 (5th Cir.), *cert. denied*, 573 U.S. 906 (2014)). Unfortunately, Advanced failed to do so, thus the chart must be stricken.

*Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003), *cert. denied*, 545 U.S. 1139 (2005); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 636 (10th Cir. 2003)).  This approach has sound justifications, "[Strict compliance] could inhibit collection of useful evidence and create perverse incentives for the parties.  Even in cases where additional medical information is clearly necessary for a proper decision, administrators would have an incentive to issue a final denial on the inadequate record . . . rather than to wait for the information . . . ."  *Gilbertson*, 328 F.3d at 635.

The facts of this case fall squarely within this "ongoing information gathering" category.  *Theriot*, 2021 WL 955152.  To be in substantial compliance, Cigna had to engage Advanced in "an ongoing productive evidence-gathering process in which the claimant is kept reasonably well-informed as to the status of the claim and the kinds of information that will satisfy the administrator."  *Gilbertson*, 328 F.3d at 636.  Cigna requested and received further information from Advanced, engaged in a dialogue with Advanced, and then after marshaling the relevant information, issued a final decision.  Importantly, Advanced was apprised of this process.  In other words, Cigna gathered evidence and information while keeping Advanced informed.  This is the exact kind of process the substantial compliance doctrine is intended to secure.  See *id*. at 635-36.  Cigna is thus entitled to summary judgment on this issue.

d.  *Meaningful Access*

To the extent that Advanced makes a separate argument that it was denied "meaningful access" to the appeals process because it was never given the SPD, this argument also fails. As noted above, Cigna was never obligated to provide Advanced with a copy of the SPD. The Fifth Circuit encountered, and rejected, a similar argument in *McGowin*. See *McGowin*, 363 F.3d at 560 ("McGowin's . . . allegation . . . is unpersuasive. She argues that she lacked the requisite information to file a claim, because her status as a third-party employee left her ineligible to receive a copy of the governing plan documents . . . McGowin argues[] she did not know how, or to whom, her claims should be presented."). Moreover, Advanced had constructive access to the SPD. Advanced's NFL patients were all free to give Advanced the SPD. It appears Advanced simply did not ask. Advanced's failure to exhaust administrative remedies cannot be excused when the relevant information was so readily available to it.

Advanced concedes that it did not formally exhaust its administrative remedies. Instead, it has presented several arguments why this failure should be excused. The court now concludes that these arguments all fail as a matter of law. As such, Cigna is granted summary judgment on the affirmative defense of failure to exhaust administrative remedies.

As an additional ground for summary judgment, the court also concludes that Cigna is entitled to summary judgment on the merits of its decision.

### 3. *Abuse of Discretion*

The parties agree on the governing legal standard. "When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101, 115 (1989)). The parties concur that the Plan vested Cigna with such discretionary authority. *See* Cigna's Motion at 29; Advanced's Motion at 29-30.

"Abuse of discretion" is evaluated under a multi-step formula. See *Connecticut General Life Insurance Company v. Humble Surgical Hospital, L.L.C.*, 878 F.3d 478, 483-84 (5th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2000 (2018); *Wildbur v. ARCO Chemical Company*, 974 F.2d 631, 637-38 (5th Cir. 1992). First, the court evaluates whether the administrator's interpretation and/or decision was "legally correct." *Humble*, 878 F.3d at 483. If the administrator's decision is found to be legally incorrect, the court must turn to the second step, whether the administrator's decision was an abuse of discretion (sometimes referred to as "arbitrary and capricious" review). See *id*. Finally, the court must determine whether an administrator's decision "was supported by substantial evidence." *Id*. The court may "'skip the first step if' it 'can more readily determine that the decision was not an abuse of discretion.'" *Id*. at 483-84 (quoting *Holland v. International Paper Company*

*Retirement Plan*, 576 F.3d 240, 246 n.2 (5th Cir. 2009)).  The court accepts this invitation.

a.  *Arbitrary and Capricious Review*

There are three relevant factors for the court to consider under the arbitrary and capricious standard.  First, the court must evaluate the internal consistency of the plan under the administrator's interpretation.  See *North Cypress Medical Center Operating Company, Ltd. v. Cigna Healthcare*, 781 F.3d 182, 196 (5th Cir. 2015).  Second, the court looks for any relevant regulations promulgated by administrative agencies.  See *Encompass Office Solutions, Inc. v. Louisiana Health Services & Indemnity Company*, 919 F.3d 266, 282 (5th Cir.), *cert. denied*, ___ U.S. ___, 140 S. Ct. 221 (2019).  Lastly, the court considers "the factual background of the determination and any inferences of lack of good faith."  *Id*.

Advanced neither cited, nor made an argument regarding, any relevant regulations.  Cigna argues that there are none, and highlights Advanced's lack of argument on this factor.  *See* Cigna's Motion at 34; Cigna's Response at 19.  Thus, this factor is either neutral or weighs in Cigna's favor since it was not acting inconsistently with any relevant regulations.

"In analyzing the internal consistency factor, the Court must determine whether Cigna's interpretation of the plan language conflicts with any other part of the plan."  *North Cypress*, 2016 WL 9330500, at *6; *Kennedy v. Electricians Pension*

-44-

*Plan, IBEW No. 995*, 954 F.2d 1116, 1124 (5th Cir. 1992) ("neither party has presented persuasive evidence that the applicable language (Section 4.01(b)) conflicts with any other provision in the Plan."). There are, in effect, two interpretations at issue. First is Cigna's interpretation of the work-related exception itself, and second, whether the Cigna had the power under the Plan to employ a presumption. A survey of Advanced's briefing highlights two potential arguments on this factor: 1) that the "work-related" exception was limited to claims where a "specific date of injury that was covered by worker's compensation" was identified; and 2) that Cigna had the power to employ presumptions only in the context of chiropractic care "in training camp or on or near game day . . . ." Advanced's Motion at 31-32.

The first argument can be disposed of easily. For starters, it is not an argument about the consistency of Cigna's interpretation with other provisions of the Plan. It is an argument for a better reading of the Plan. However, at this stage, the court is not evaluating whether Cigna's interpretation is the correct one or even the only one. It is only assessing if Cigna's interpretation *conflicts* with the Plan. Advanced does not cite any provision of the Plan (or SPD) that is in conflict with Cigna's interpretation. Moreover, Cigna's interpretation actually appears more consistent with other provisions than does Advanced's. For example, the Plan defines "Occupational Injury" as "an accidental bodily injury which arises from, or is complicated by, any employment or occupation for compensation or profit." Cigna's

Appendix at 852.  This definition does not distinguish between chronic injuries and specific injuries.  It simply ties the injury to employment.

Though it is on topic, the second argument is also unpersuasive.  Quoting from its brief, Advanced argues "[t]he only language in the Plan that allows the use of presumptions is related to the chiropractic benefits[19] . . . The Plan contains no language that allows Cigna to treat a claim as presumptively work-related . . . ."  Advanced's Motion at 31-32.  The first part of this argument amounts to an *expressio unius*[20] argument.  Though a valid canon of statutory interpretation, the court is not interpreting a statute here.  Moreover, the court is looking for *inconsistencies*, not implications based upon structure.  The provision that Advanced cites does not contain any limiting language such as "only" or "exclusively."  It is therefore plausible to conclude that the chiropractic presumption language is not meant to exclude the use of presumptions in other contexts.  To illustrate this point further, another plausible implication of the chiropractic presumption is that the Plan in fact affirmatively endorses the use of presumptions.[21]  This was just one example, but not

---

[19]     The court notes that the language Advanced cites is actually from the SPD.

[20]     The full name of the canon is *expressio unius est exclusio alterius*, meaning "the expression of one thing suggests the exclusion of all others."  William N. Eskridge Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 78-79 (2016).

[21]     It might, for example, conserve the plan administrator's resources to, when justified, presume a claim should be denied rather than going through the process of investigating it every time.

the only permissible use. The court thus cannot conclude that Cigna's employment of a presumption was inconsistent with the Plan.

Advanced's argument also assumes that Cigna had the ability to do only what the Plan enumerated it could do. But this is again based upon implications from structure, not specific language inconsistent with Cigna's interpretation. Furthermore, it is an unsound canon of construction for the Plan. The Plan is also silent regarding the plan administrators' ability to investigate claims beyond material submitted by a claimant. Advanced's argument would mean Cigna did not have that power. Yet, Advanced does not challenge Cigna's use of the SIU or the investigative methods it used. That is likely because it is obvious that Cigna's authority went beyond what was explicitly enumerated in the Plan. Moreover, the Plan language confirms that Cigna's powers were broader. Article IX, Section 9.1 of the Plan, which enumerates the powers of plan administration, states in part "[s]uch authority [of the administrator] includes, *but is not limited to*, the power to: . . ." and then it goes on to list various powers. Cigna's Appendix at 877 (emphasis added). As such, it appears that Cigna's reading is actually more consistent with the Plan than Advanced's.

This is not the first time a court in this circuit has seen Cigna employ a presumption of this magnitude. In the *North Cypress* case (cited extensively above), Cigna instituted a "fee-forgiving protocol" that assumed the provider was discounting its services to patients, and would continue the protocol "until [the provider]

presented 'clear evidence'" that it had stopped.  See *North Cypress*, 2018 WL 3738086, at *7.  The court mentions this simply to illustrate that Cigna did nothing extraordinary in this case.  It buttresses the court's conclusion that Cigna's interpretation of the Plan does not create clear inconsistencies.

This brings the court to "the factual background of the determination and any inferences of lack of good faith." *Encompass Office Solutions*, 919 F.3d at 282.  At the outset, it is important to take account of how this factor fits within the doctrinal scheme.  "The [Supreme] Court further held that 'a reviewing court should consider [a] conflict [of interest] as a factor in determining whether the plan administrator has abused its discretion in denying benefits.'  The significance of the conflict 'depend[s] upon the circumstances of the particular case.'" *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 257-58 (5th Cir. 2009) (quoting *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 108 (2008)) (internal citations omitted).  Thus, even if the court finds a conflict, it would not be dispositive.

 Advanced does not dispute that the Plan is funded by the NFL member clubs, not Cigna, thus making this case dissimilar to both *Glenn* and *Stone*.  Instead, Advanced argues that "Cigna adopted the NFL's inherent conflict of interest by having the NFL involved in the benefit determination."  Advanced's Motion at 33.  Curiously, this assertion is not backed up by any record citations.  Moreover, it is functionally the same argument that the court rejected in the "futility of appeal"

analysis above.

Even if the court were to give this argument some credence, it would still be incumbent upon Advanced to prove "circumstances [that] suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 117. Otherwise, the conflict will "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Id*. Advanced's argument that "Cigna and the Plan wanted to deny Advanced's claims and then Cigna fashioned a reason to deny them"[22] is contradicted by the record. The "work-related" exception was not fashioned together just to deny Advanced's claims, nor is there any evidence that Cigna concocted it as a reason after already deciding to deny the claims. Cigna did not place the hold on Advanced's claims until *after* Cigna began to suspect that Advanced was treating work-related injuries. If Cigna had already decided to deny Advanced's claims, why would it wait to place the hold until it had a reason? The record shows that Cigna first became suspicious of Advanced, conducted an investigation, then decided to deny its claims, not the other way around.

Cigna's use of the presumption, or as Advanced calls it, the "blanket denial,"

---

[22]     Advanced's Motion at 34.

does not suffice either.  As already established, the Plan explicitly endorses the use of one presumption.  It requires an unwarranted leap of logic to extrapolate that the use of a presumption in a different context must be evidence of bad faith.  Furthermore, this argument asks the court to divorce the presumption from its context.  Whether the presumption was used in good or bad faith depends on the evidence before Cigna.  In other words, this is an argument more fit for the "substantial evidence" prong, not here.

Lastly, Advanced's argument that Cigna has "singled out Advanced" for disparate treatment is simply incorrect.  Cigna imposed a substantially similar requirement on the provider in *North Cypress*.  See *North Cypress*, 2018 WL 3738086, at *7.  This same requirement was upheld in *Humble*.  See *Humble*, 878 F.3d at 485-86.  Whatever would have been the persuasive weight of this argument, it is greatly diminished by its incorrectness.

In sum, Advanced has not presented evidence that Cigna was compromised by any of the traditional conflicts of interest.  More precisely, hiring Cigna to administer a plan funded by the NFL member clubs is a "step[] to reduce potential bias and to promote accuracy . . . ."  *Glenn*, 554 U.S. at 117.  On top of that, Advanced's "further evidence" of bad faith provides little, if any, support for its argument.  Even if the court accepts that there is some evidence of bad faith, it is one factor among many to consider, and worth relatively little under these circumstances.

Given the relevant factors, the court concludes that Cigna did not act in an arbitrary or capricious manner. It did not violate any regulations. Advanced cannot show any clear inconsistencies between Cigna's interpretation of the Plan and the Plan language. And, even if there was a conflict or some evidence of bad faith, under these circumstances it does not outweigh the first two factors. Cf. *Stone*, 570 F.3d at 262 ("So, even assuming *arguendo* that a conflict exists, it is attenuated at best."). The court will thus uphold Cigna's determination, and award it summary judgment, if Cigna's decision was based on substantial evidence. Cf. *Humble*, 878 F.3d at 485 ("In other words, having concluded that Cigna could interpret its plan to prohibit fee-forgiving, we must decide whether there was substantial evidence that Humble actually engaged in fee-forgiving.").

b. *Substantial Evidence*

"'Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' In making this inquiry, we are 'constrained to the evidence before the plan administrator.'" *Id*. (quoting *Corry v. Liberty Life Assurance Company of Boston*, 499 F.3d 389, 398 (5th Cir. 2007); *Killen v. Reliance Standard Life Insurance Company*, 776 F.3d 303, 312 (5th Cir. 2015)). When compared to the facts of *Humble* (nearly identical to the facts of *North Cypress*), there is no reasonable doubt that Cigna's decision was based on substantial evidence. The *Humble* court was similarly

presented with a "sweeping response" by Cigna to a provider's practices. See *id*.

Nonetheless, this "sweeping response" was supported by substantial evidence where:

> Cigna sent surveys to members who had received medical treatment at Humble, requesting "additional information." Among other things, the surveys asked what the member had been told regarding "responsibility for any non-paid costs, i.e., deductible, coinsurance." Cigna received 154 responses. Many members indicated that Humble had informed them that they would not be charged their full member cost-share. For example, Member "R.R." received $25,191.00 worth of care at Humble. She spoke with Humble before the surgery and four months after surgery and was informed that "everything was covered [at] 100%." Under her insurance plan, she should have been billed $2,745.83. Likewise, Member "M.N." was charged just $276 for $27,600.00 worth of treatment and told that this amount "was all [he] was responsible for." Humble should have charged M.N. $6,974.49 under the plan.

*Id*. at 485-86. The evidence before Cigna in this case was even stronger. Cigna's request for and review of 36 patient medical records from Advanced is analogous to the survey conducted in *Humble*. Both gave Cigna a sampling of the providers' practices. Both also confirmed Cigna's suspicions regarding the providers. In this case, however, Cigna's investigation went further. Not only did Cigna's internal personnel opine that Advanced was treating work-related injuries, an outside entity, HCFS, came to the same conclusion. Further still, Advanced's own personnel (Chris Carter) affirmatively stated that "[Advanced's services] provides [players] a much greater chance to receive NFL disability money in line with the three forms of disability established by the NFL: Line of Duty, Neurocognitive, Total and Permanent." Cigna's Appendix at 469. The evidence before Cigna in this matter

thus went well beyond the precedent for "substantial evidence" set in *Humble*.

Advanced responds by saying "[t]hat is all.  Cigna reviewed 36 patient records, someone mentioned disability benefits, and Cigna decided that allowed them under the Plan to presumptively deny all claims filed by Advanced under the Plan." Advanced's Response at 24.  Yes, a sampling of medical data and plausible confirmation from the provider is "substantial evidence."  In *Humble*, Cigna had only the medical data.  It had more here.  Advanced ostensibly concedes as much.  Thus, Cigna's decision was supported by substantial evidence as a matter of law.

Having thus concluded that Cigna did not act arbitrarily or capriciously and that its decision was based on substantial evidence, the court grants Cigna's motion for summary judgment on the additional ground that Cigna's decision was not an abuse of discretion.

### III.  <u>CONCLUSION</u>

For the reasons state above, Cigna's motion for summary judgment is

**GRANTED**, Advanced's motion for summary judgment is **DENIED**, and Cigna's

motion to strike is **GRANTED IN PART** and **DENIED IN PART** as moot.

Judgment will be entered for the defendants.

**SO ORDERED**.

July 8, 2021.

A. JOE FISH
**Senior United States District Judge**